IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                  Plaintiff,<br><br>v.<br><br>RYAN GREGORY BRACKEN,<br><br>                  Defendant. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL<br><br><br>Case No. 2:24-CR-132 TS<br><br>District Judge Ted Stewart |

This matter is before the Court on Defendant's Motion for Judgment of Acquittal. Following the conclusion of the government's presentation in its case-in-chief, on October 2, 2024, Defendant orally moved for a judgment of acquittal on all counts under Federal Rule of Criminal Procedure 29(a). Following the Motion, the Court took the matter under advisement. The Court now denies Defendant's Motion for the reasons described herein.

I.       STANDARD

Federal Rule of Criminal Procedure 29(a) provides: "After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." In considering a sufficiency of the evidence challenge, the Court must "review the evidence and its reasonable inferences in the light most favorable to the government" and

"determine whether a reasonable jury could find the defendant guilty beyond a reasonable doubt."[1] The Court must not "weigh conflicting evidence or consider witness credibility."[2]

## II.   BACKGROUND

Defendant Ryan Gregory Bracken ("Bracken") is charged with six Counts. Counts I, III, IV, V, and VI charge Bracken with stalking Rosie Rivera, Will Kocher, Tyler Andrus, Hillary McCormack, and Brigham Lundberg, respectively, in violation of 18 U.S.C. § 2261A; Count II charges Bracken with Interstate Communication of Threats in violation of 18 U.S.C. § 875.

In support of its case, the government presented evidence supporting the following.[3] In the spring of 2024, various Salt Lake County employees, as well as attorneys for the law firm Halladay, Watkins, and Mann, received numerous intimidating phone calls from Bracken's cell phone.

On April 2, 2024, the Salt Lake County Sheriff public phone line received several phone calls from a phone number showing Bracken's name on the caller ID. The phone calls were directed to Sheriff Rosie Rivera, and she testified that her receptionist had recorded a message which featured a male voice screaming at her. The voice was unintelligible. Later the same day, HR specialist Tami Cordova answered a phone call from a person the caller ID identified as "Ryan Gregory Bracken." He asked her to put Sheriff Rivera on the phone, but Cordova could not respond because Bracken would not stop yelling. In this phone call, he stated that any police officers who came onto his property would be shot and that there would be "dead cops on [his]

---

[1] *United States v. Ramos-Arenas*, 596 F.3d 783, 786 (10th Cir. 2010) (citing *United States v. Phillips*, 583 F.3d 1261, 1264 (10th Cir. 2009)).

[2] *Id.* (quoting *United States v. Castorena-Jaime*, 285 F.3d 916, 933 (10th Cir. 2002)).

[3] The below summary is not a complete accounting of the evidence presented by the government but is instead a summary of the evidence presented that is relevant to this Motion.

driveway." Cordova was "shocked" because threats to kill police officers are "scary." She reported the call to law enforcement and wrote a statement that day.

Corey Hess, manager of phone communications at Salt Lake County, testified about a phone call log showing incoming and outgoing calls between various Salt Lake County government offices and Bracken's cell phone, indicating that there had been at least 54 calls to and from Bracken's cell phone number over the course of several days.[4] Hess testified that on March 20, 2024, Bracken called the Sheriff Administrator's main number six times within 20 minutes. He also testified about a series of phone calls to the Sheriff's office on March 29, 2024; a series of calls to the Assessor's and Recorder's Offices on April 1, 2024; and another series of calls to the Sheriff's Office on April 2, 2024. He also testified that County employees can elect to have their voicemails sent to their email accounts.

Lisa Smith, a civil processor with the Salt Lake County Sheriff's office, testified about multiple phone calls she received from Bracken on April 2, 2024. Recordings of the calls were played and admitted as evidence. In the recorded phone calls, Bracken threatened to continue calling the Salt Lake County governmental offices until "that bitch," which Ms. Smith understood to be Sheriff Rivera, answered.[5] In the second recorded phone call from April 2, Bracken stated that Sheriff Rivera would "hang from a rope" and "there might be some bloodshed" at the courthouse where the foreclosure sale of his home was going to take place.[6] Bracken also stated, "I shouldn't have to remind you what the punishment for treason is," which he had previously stated was death by hanging.[7] Ms. Smith reported the calls to law

---

[4] Exhibit 23.

[5] Exhibit 2.

[6] Exhibit 3.

[7] *Id.*

enforcement, and the Salt Lake County Sheriff's Office opened an investigation. Detective Jacob Fuller, who shared an office with Ms. Smith, also testified about the calls to Ms. Smith and said he took the threats seriously because of Bracken's demeanor and the detail that he used to describe how he would defend his home, including the specific 7.62 mm rifle ammunition he would use and that he was a crack shot. Detective Fuller referred the phone number used to make the calls to the Major Investigations Unit (MIU) task force.

In response to the phone calls, Detective Dallas Crump, another Salt Lake County deputy, created an informal operations plan for the foreclosure auction in case Bracken attended. Detective Crump included Unified Police, S.W.A.T., and the Salt Lake County Sheriff's Office in this plan. Detective Crump testified that officers reacted so seriously because threats of gun violence are always a concern, and that it would be "negligent" not to prepare a plan in this case. A member of the S.W.A.T and surveillance team, Officer Rick Quezada, also testified about law enforcement's reaction to Bracken's phone calls and statements, described the surveillance his team performed on Bracken's home, and testified about a GPS tracker placed on Bracken's truck. West Valley City Detective Tyson Butterfield testified about a search warrant he obtained and executed on Bracken's home after he received a phone call from Bracken. Butterfield testified that during the search, officers found ammunition cans with "7.62 mm" cartridges, which matched the ammunition Bracken stated he would use, as well as rifle ammunition.[8] Officers also found a Kalashnikov semi-automatic rifle in the home.[9]

Will Kocher, Deputy County Recorder for Salt Lake County, testified that on April 1, 2024, his office received three phone calls from Bracken. On his personal landline extension, he

---

[8] Exhibits 16, 20.
[9] Exhibits 17, 18.

4

received a voicemail from Bracken which was sent to him via email. The recording was admitted into evidence, and in that recording, Bracken called Mr. Kocher by name and stated that he was liable for treason. Bracken went on to state that "I shouldn't have to remind you what the penalty for treason is . . . Last I checked it was fucking death."[10] These "unhinged" statements alarmed Mr. Kocher to the extent that he requested that Bracken be "trespassed," from the government center, if he ever arrived in person, which would mean he could not lawfully remain on the property.

Jessalyn Halbritter, a Microsoft employee, testified that Salt Lake County employees can elect to have their voicemails sent through email and that those files were stored in Microsoft Data Centers outside of the state of Utah.

Tyler Andrus, Deputy County Assessor, testified that on April 1, 2024, he received a message from Bracken. He returned the call and recorded it, thinking it would be an April Fool's joke. He testified that their conversation left him shaken because of Bracken's "pure vitriol."[11] The recording was admitted into evidence. Mr. Andrus ended the conversation by hanging up the phone, and Bracken immediately called him back, accusing Mr. Andrus of treason and promising that Mr. Andrus would be "swinging at a fucking end of a rope."[12] Bracken also mentioned that he had immunity from the law and asked Mr. Andrus if he "knew a doctor," which Mr. Andrus took to mean that Bracken wanted to hurt Mr. Andrus.[13] Bracken called back three more times that day. As a result of Bracken's calls, Mr. Andrus warned his family to disassociate themselves from him on the internet and filed to have his public records become private.

---

[10] Exhibit 4.
[11] Exhibit 6.
[12] Exhibit 8.
[13] Id.

Attorney Hillary McCormack received phone calls from Bracken in early March 2024, after her law firm posted a notice on Bracken's home of his home's foreclosure sale. On April 3, 2024, Bracken left her three voicemails, all of which were admitted into evidence. In the first voicemail, Bracken is heard accusing her and her firm of breaking the law and that there was a "tall tree with a short rope" with the names of "barristers" on it.[14] She understood "barristers" to mean her and her colleague Brigham Lundberg because they were the attorneys involved in the foreclosure sale of Bracken's home, and she understood "barristers" to refer to attorneys. In the second voicemail, Bracken stated that he would open fire on anyone who came to his house. Ms. McCormack testified that this message left her distressed because he mentioned a specific caliber of bullets and firearms involved.[15] In the third voicemail, Bracken promised that if anyone came to evict him, he would "cut [them] down where they fucking stand" and he would "spit 7.62 by .39 mm right at [their] fucking heads."[16] Ms. McCormack took steps to protect herself and her family and also notified her firm's managing partner that the trustee's sale would require additional safety precautions.

Ms. McCormack's colleague, Brigham Lundberg, also testified that he received calls and voicemails from Bracken throughout March 2024 after his firm served a notice of the trustee's sale on Bracken's home. The call from Bracken was different from others he had received from disgruntled borrowers because it was so violent and specific. In another voicemail left on Lundberg's phone, Bracken addressed Ms. McCormack and Mr. Lundberg by name, stating that he would "open fire on anybody that steps foot on [his] property."[17] Mr. Lundberg later recorded

---

[14] Exhibit 11.
[15] Exhibit 12.
[16] Exhibit 13.
[17] Exhibit 14.

a similar voicemail, where Bracken made threats that he would "spit hot lead" and "do what it takes" to prevent the foreclosure sale from happening at the Matheson Courthouse on April 8, 2024.[18] Mr. Lundberg took it as a threat and warned his family as well.

### III.   DISCUSSION

Bracken argued at the close of the government's case-in-chief that he should be acquitted on all charges because the government did not satisfy its burden to prove his intent when he made the phone calls to any of the five victims. He also argued that the government had not proved that his statements would be reasonably expected to cause substantial emotional distress, nor that his comments would reasonably be perceived as threats.

A. Stalking, Counts I, III, IV, V, and VI

To sustain a conviction for stalking under 18 U.S.C. § 2261A, as charged in Counts I, III, IV, V, and VI of the Superseding Indictment,[19] the government must present evidence to support that: (1) on or about a specific date, the defendant used a facility of interstate commerce to engage in a course of conduct with (2) the intent to harass and intimidate another person, (3) and as a result of such use of a facility of interstate or foreign commerce, the defendant engaged in conduct that caused, attempted to cause, or would be reasonably expected to cause substantial emotional distress to that person.[20]

For the first element, a "facility of interstate commerce" includes a cell phone.[21] Additionally, the statute defines "course of conduct" as "a pattern of conduct composed of 2 or

---

[18] Exhibit 15.

[19] Docket No. 56.

[20] *See* 18 U.S.C. § 2261A; *Counterman v. Colorado*, 600 U.S. 66, 79–80 (2023.

[21] *United States v. Means,* 297 F. App'x. 755, 759 n.5 (10th Cir. 2008) ("Cellular telephones are instrumentalities of interstate commerce") (citing *United States v. Evans*, 476 F.3d

more acts, evidencing a continuity of purpose."[22] "Course of conduct" refers to acts intended to harass or intimidate a particular victim, and includes acts directed to third parties as long as the act is intended to affect the individual victim.[23] Under the second element, intent to harass means that the defendant intended to distress the victim through threatening, intimidating, or other behavior.[24] A "threat" is a serious statement that expresses intent to instill fear, which, under the circumstances, would cause apprehension in a reasonable person, as distinguished from mere political argument, idle talk, exaggeration, or something said in a joking manner.[25]

### Count I—Sheriff Rosie Rivera

The government presented sufficient evidence to support a conviction for Count I.

First, a jury could reasonably find that Bracken used a facility of interstate commerce to engage in a course of conduct directed at Sheriff Rivera. Bracken's phone records and the demonstrative phone log exhibit showed at least six calls from Bracken's cell phone to the Salt Lake County government offices on April 2, 2024. Additionally, Lisa Smith, Sheriff Rivera, and Tami Cordova also testified about the phone calls and voicemails from Bracken's cell phone directed at Sheriff Rivera on the same date.

Second, a jury could reasonably find that Bracken had an intent to harass and intimidate Sheriff Rivera. The government supported this claim by presenting evidence of Bracken's

---

1176, 1180 (11th Cir. 2007). *See also United States v. Weathers*, 169 F.3d 336, 341 (6th Cir. 1999).

[22] 18 U.S.C. § 2266(2).

[23] *See, e.g. United States v. Shrader*, 675 F. 3d 300, 312–14 (4th Cir. 2012) (finding that the statute's unit of prosecution is the victim, not the entire course of conduct).

[24] *See United States v. Yung*, 37 F.4th 70, 80 (3rd Cir. 2022) (citing *United States v. Ackell*, 907 F.3d 67, 76 (1st Cir. 2018)).

[25] *See United States v. Wheeler*, 776 F.3d 736, 742 (10th Cir. 2015).

incessant phone calls and messages to the Sheriff's administrative line, the Sheriff's Office main line, and the civil processors' line. Indeed, in the phone call recording Lisa Smith made, Bracken stated he would keep calling until Sheriff Rivera answered. The evidence also supported that Bracken was seeking to stop what he perceived to be a "Sheriff's sale" of his property.

Third, a jury could reasonably find that Bracken's course of conduct caused, attempted to cause, or would reasonably be expected to cause, substantial emotional distress to Sheriff Rivera. A jury could reasonably find that it would be distressing to hear Bracken's specific statements about what would befall her or her officers if they went to his home (e.g. exhibits where Bracken mentioned specific ammunition and guns that would be used, that the Sheriff would be swinging from the end of a rope, that the penalty for treason is death). Salt Lake County Sheriff's Office robust response to the phone calls also indicates that law enforcement was alarmed by Bracken's statements: Detective Crump's testified that he created an operations plan for the foreclosure sale in response to Bracken's mention of firearms, Officer Quezada testified that he was part of a team that responded to Bracken by surveilling his home and tracking his vehicle by GPS, and Detective Butterfield testified that he served a search warrant to seize firearms and ammunition in Bracken's home. During the search, his team found firearms and ammunition that matched what Bracken had mentioned in his phone calls.

Viewed in the light most favorable to the government, the evidence is sufficient to support that Bracken committed Stalking in violation of 18 U.S.C. § 2261A(2). The Court will therefore deny Bracken's Motion as to Count I.

Count III—Will Kocher

The government presented sufficient evidence to support a conviction for Count III.

9

First, a jury could reasonably find that Bracken used a facility of interstate commerce to engage in a course of conduct directed at Will Kocher. The phone log and Mr. Kocher's testimony showed that Bracken used his cell phone to call the Recorder's Office multiple times on April 1, 2024.

Second, a jury could reasonably find that Bracken's intent was to intimidate or harass Mr. Kocher. Mr. Kocher's testimony that Bracken called the Recorder's Office multiple times on April 1, 2024, as well as the voicemail left for Mr. Kocher provides sufficient evidence of intent to harass or intimidate: Bracken's communications were so aggressive the spurred Mr. Kocher to request that Bracken be "trespassed" if he came to the government center in person, meaning he would be escorted off the premises.

Third, a jury could reasonably find that Bracken's actions would cause substantial emotional distress. In the voicemail left on Mr. Kocher's landline, Bracken threatened to kill Mr. Kocher. Mr. Kocher indicated that he was shocked and concerned for his safety, viewing the message as "rather unhinged."

Viewed in the light most favorable to the government, the evidence is sufficient to support that Bracken committed Stalking in violation of 18 U.S.C. § 2261A(2). The Court will therefore deny Bracken's Motion as to Count III.

<u>Count IV—Tyler Andrus</u>

The government presented sufficient evidence to support a conviction for Count IV.

First, a reasonable jury could find that Bracken used a facility of interstate commerce to engage in a course of conduct directed at Tyler Andrus. Phone records and Mr. Andrus's testimony established that Bracken used his cell phone to call Mr. Andrus and the Assessor's office multiple times on April 1, 2024.

Second, a reasonable jury could find that Bracken's behavior indicated an intent to harass and intimidate Mr. Andrus. Mr. Andrus testified that after he returned Bracken's original call, Bracken called him back multiple times, belittling Mr. Andrus, calling him names, and threatening that Andrus would be swinging at the end of a rope. Further, as with the other recordings played for the jury, the recording of Bracken's phone call to Andrus generally provided evidence of intent to harass and intimidate considering Bracken's tone, statements, and general demeanor. There was no apparent purpose in Bracken's behavior other than to harass Mr. Andrus personally.

Third, a reasonable jury could find that Bracken's behavior would cause substantial emotional distress to Mr. Andrus. Mr. Andrus testified that Bracken's personal attacks and frightening language left him shocked and threatened. Indeed, during the recorded phone call, Mr. Andrus asked Bracken if he was threatening him. Mr. Andrus testified that he took the entire message to mean that Bracken was planning on hurting him, and because of this conversation and other sentiments, including that "[Bracken's] government" was going to deal with him, he removed his public records and notified his family to also go "private" and disassociate themselves from him online.

Viewed in the light most favorable to the government, the evidence is sufficient to support that Bracken committed Stalking in violation of 18 U.S.C. § 2261A(2). The Court will therefore deny Bracken's Motion as to Count IV.

Count V—Hillary McCormack

The government presented sufficient evidence to support a conviction for Count V.

First, the following evidence is sufficient to support that Bracken used a facility of interstate commerce in a specific course of conduct directed at Hillary McCormack. Ms.

11

McCormack testified that she received multiple calls and voicemails from Bracken throughout March and April. Specifically, she testified that she received three phone calls from Bracken on April 3, 2024, and Bracken's cell phone records showed those calls.

Second, a jury could reasonably find that Bracken's behavior indicated an intent to harass and intimidate Ms. McCormack. Ms. McCormack testified that Bracken called to discuss his home's foreclosure, but that eventually he left voicemails in which he was screaming at her to end the imminent foreclosure of his home. Three voicemails from April 3, 2024, were admitted into evidence. On the voicemails, Bracken threatened Ms. McCormack's life, and this threat was conditioned on the foreclosure of his home. The evidence supports that Bracken's intent in making these many calls was to intimidate or harass Ms. McCormack to achieve Bracken's goal of stopping the foreclosure sale.

Third, a jury could reasonably find that Bracken's behavior could cause substantial emotional distress to Ms. McCormack. In Bracken's voicemails and calls, he stated that there was a "tall tree with a short rope" with the name of "barristers" on it were the foreclosure sale to go forward, and a reasonable jury could conclude that this would be distressing at the very least. Ms. McCormack, who is an attorney, testified that she understood "barristers" to be referring to her and her colleague, Brigham Lundberg. Additionally, in the recorded voicemails presented at trial, Bracken indicated that he was armed and ready to kill anyone who stepped onto his property. A jury could reasonably find this would, at a minimum, be reasonably expected to cause emotional distress.

Viewed in the light most favorable to the government, the evidence is sufficient to support that Bracken committed Stalking in violation of 18 U.S.C. § 2261A(2). The Court will therefore deny Bracken's Motion as to Count V.

Count VI—Brigham Lundberg

The government presented sufficient evidence to support a conviction for Count VI.

First, the following evidence is sufficient to support that Bracken used a facility of interstate commerce in a specific course of conduct directed at Brigham Lundberg. Like Ms. McCormack, Mr. Lundberg testified that he received multiple calls and voicemails from Bracken throughout March and April, but especially violent ones on April 3, 2024. Bracken's cell phone records showed those calls.

Second, a jury could reasonably find that Bracken's intent was to intimidate or harass Mr. Lundberg. In a recorded voicemail left on Mr. Lundberg's phone, Bracken promised that anyone who came to the foreclosure sale on April 8 would be "shut down" and that he would open fire to protect his property. In another voicemail, Bracken indicated that he intended to attend the foreclosure sale of his home at the Matheson Courthouse and that he was "planning to do what it takes" to stop the sale, including "spit[ting] hot lead." The evidence supports a finding that Bracken intended to harass and intimidate.

Third, a jury could reasonably find that Bracken's behavior would reasonably be expected to cause substantial emotional distress. This is supported by the content of the recordings and the threats included in those messages. Mr. Lundberg's testified that he had never been subject to threats of that severity before, and the threats caused him to put his family on alert and coordinate with the Matheson Courthouse to ensure extra security for the foreclosure sale.

Viewed in the light most favorable to the government, the evidence is sufficient to support that Bracken committed Stalking in violation of 18 U.S.C. § 2261A(2). The Court will therefore deny Bracken's Motion as to Count VI.

Interstate Communication of Threats, Count II

To sustain a conviction of Interstate Communication of Threats, the government must prove beyond a reasonable doubt that on or about April 1, 2024, the defendant (1) knowingly transmitted a communication containing a threat to cause physical injury to Will Kocher (2) with the intent to make a threat, or with knowledge that the communication would be viewed as a threat, or with reckless disregard that the communication would be viewed as a threat; and (3) the defendant transmitted the communication in interstate commerce. For the second element, the government must prove beyond a reasonable doubt that the defendant acted recklessly as to whether his behavior would be perceived as harassing or intimidating.[26] Conditional statements may still be a true threat if they are used to persuade an individual from taking a particular action.[27]

The government presented sufficient evidence to sustain a conviction under Count II.

First, a jury could reasonably find that Bracken knowingly transmitted a communication that threatened to at the least injure Will Kocher. Mr. Kocher testified about multiple phone calls and a voicemail recording in which Bracken threatened to bring punishment for "treason" for which the punishment was "death." The evidence supports that Bracken, at the very least, transmitted a threat to cause physical injury.

Second, a jury could reasonably find that Bracken made the communication with the intent to make a threat, with the knowledge that the communication would be viewed as a threat,

---

[26] *Counterman*, 600 U.S. at 79–80.

[27] *United States v. Dillard*, 795 F.3d 1191, 1200 (10th Cir. 2015) ("Most threats are conditional; they are designed to accomplish something; the threatener hopes that they *will* accomplish it, so that he won't have to carry out the threats. They are threats nonetheless.") (citing *United States v. Schneider*, 910 F.2d 1569, 1570 (7th Cir. 1990).

14

or with reckless disregard that the communication would be viewed as a threat. This is supported by Bracken's behavior on the voicemail, including a death threat, vulgarity, and a menacing tone. Specifically, Bracken promised in the voicemail that Mr. Kocher was liable for "treason" and that the punishment for treason was "death." This supports a reasonable conclusion that the phone call contents were, at the least, made with reckless disregard that the communications would be viewed as a threat.

Third, a jury could reasonably find that Bracken transmitted the communication in interstate commerce. The demonstrative exhibit showed that Bracken used his cell phone to call the Recorder's office at least five times on April 1, 2024. The government also introduced evidence that the voicemail that Mr. Kocher heard was redirected through Mr. Kocher's email. The Microsoft employee testified that such a message would be transported in interstate commerce because the server storing the message is located outside the state of Utah.

Viewed in the light most favorable to the government, the evidence is sufficient to support that Bracken committed Interstate Communication of Threats in violation of 18 U.S.C. § 875(c). Therefore, the Court will deny Bracken's motion as to Count II.

## IV.   CONCLUSION

It is therefore

ORDERED that Defendant's Motion for Judgment of Acquittal is DENIED.

DATED this 7th day of October, 2024.

BY THE COURT:

_____
Ted Stewart
United States District Judge

15